**Charles A. TUCKER, Sr.,
Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 70A05–9402–CR–62.

Court of Appeals of Indiana,
Fifth District.

Feb. 13, 1995.

Susan K. Carpenter, Public Defender, J. Michael Sauer, Deputy Public Defender, Indianapolis, for appellant.

Pamela Carter, Atty. Gen., Cynthia L. Ploughe, Deputy Atty. Gen., Indianapolis, for appellee.

## OPINION

BARTEAU, Judge.

Charles A. Tucker appeals his conviction of home improvement fraud, a Class C felony, raising five issues:

1. Whether spraying for termites is a "home improvement" under the home improvement fraud statute;

2. Whether Tucker caused the victim to enter into a contract;

3. Whether there was evidence of two contracts;

4. Whether there was evidence that both houses owned by the victim were residential property; and

5. Whether Tucker was denied a fair trial by prosecutorial misconduct.

## FACTS

Viewed most favorably to the State, the evidence shows that Tucker went to the home of Eva Robinson, an eighty-two-year old woman, and told her that he was there to check for termites. When Robinson told Tucker that a company in Shelbyville always performed that task, Tucker replied, "We bought them out," and Robinson allowed Tucker to inspect for termites. Tucker showed Robinson a piece of wood with a bug crawling on it and told Robinson that her house had termites. Tucker was at Robinson's house for thirty to forty-five minutes and then told Robinson that she owed him $2400. Meanwhile, a visiting friend of Robinson's, Mildred Rogers, noticed another man across the street at a rental house owned by Robinson. The man was carrying what looked like a bug spray tank and seemed to be spraying around the house. It is not clear from the record whether Tucker sprayed Robinson's home or did anything else to exterminate the termites. Robinson gave Tucker a check for $2400 and left the "pay to the order of" line blank for Tucker to fill in. The check was later made out to Angela Beasley. Tucker returned to Robinson's home the next day and told her that she owed him $96 for her rental property across the street. Robinson gave him a check for $96, again with the payable to line left blank. When the check was cashed, it was made out to Angela Beasley in the amount of $9600.

## HOME IMPROVEMENT FRAUD

Tucker was charged with home improvement fraud as a class C felony. Pursuant to Ind.Code 35–43–6–12(a)(4), Tucker was charged with entering into a home improvement contract and knowingly using or employing any deception, false pretense, or false promise to cause a consumer to enter into a home improvement contract. The offense was enhanced to a class C felony because Robinson is at least sixty years old and the State alleged that two or more home improvement contracts exceeding an aggregate amount of $1000 had been entered into in furtherance of a common fraudulent scheme, design, or intention. *See* I.C. 35–43–6–13(c)(2).

Indiana Code 35–43–6–4 defines a "home improvement contract" as an oral or written agreement to make a home improvement and for which the contract price exceeds $150. A "home improvement" is defined as: "any alteration, repair, or other modification of residential property." I.C. 35–43–6–3.

### HOME IMPROVEMENT

Tucker argues that there is no evidence of an agreement between Tucker and Robinson to make a "home improvement" because spraying for termites does not constitute an alteration, repair, or other modification of residential property. This presents a question of first impression in Indiana and our research has not uncovered any other state that has addressed the issue whether spraying for termites is an alteration, repair or modification of residential property. Thus, we turn to rules of statutory construction for guidance.

We begin by noting that penal statutes must be construed strictly against the State and may not be enlarged beyond the fair meaning of the language used to include offenses other than those clearly defined. *Bond v. State* (1987), Ind., 515 N.E.2d 856, 858. At the same time, penal statutes should not be overly narrowed so as to exclude cases they fairly cover. *Barger v. State* (1992), Ind., 587 N.E.2d 1304, 1306, *reh'g denied.* "If possible, they should be allowed to perform their intended mission as shown by the existing evils intended to be remedied." *Id.* (quoting *Morris v. State* (1949), 227 Ind. 630, 632, 88 N.E.2d 328, 329). On the other hand, penal statutes cannot be construed to include anything beyond their letter, though within their spirit. *Gore v. State* (1983), Ind.App., 456 N.E.2d 1030, 1033. When the legislature defines a word, this Court is bound by that definition in construing the statute, even though the definition may conflict with the common meaning of the word. *Consolidation Coal Co. v. Indiana Dep't of State Revenue* (1991), Ind., 583 N.E.2d 1199, 1201; *Spaulding v. International Bakers Services* (1990), Ind., 550 N.E.2d 307. Where the legislature has not defined a word, we must attribute common and ordinary meaning to the word. *Consolidation Coal Co.,* 583

N.E.2d at 1201. Further, where the statute is clear and unambiguous on its face, we cannot interpret the statute, but must simply give the statute its apparent or obvious meaning. *Matter of Grissom* (1992), Ind., 587 N.E.2d 114, 116.

Applying these principles, we conclude that the legislature's definition of "home improvement" does include spraying for termites. "Home improvement" is defined as any alteration, repair or other modification of residential property. I.C. 35–43–6–3. Black's Law Dictionary defines "alteration" as "variation; changing; making different." It defines "repair" as "to mend, remedy, restore, renovate." "Modification" is defined as "a change." The American Heritage Dictionary of the English Language defines "alteration" as "1. The act or procedure of altering. 2. The condition resulting from altering; a modification; change." "Repair" is defined as "1. To restore to sound condition after damage or injury; fix." "Modification" is defined as "a small alteration, adjustment, or limitation."

It is clear that these words express the notion of doing something to the property, including remedying a problem. Certainly, spraying for termites will remedy the infestation of termites. Also relevant in determining whether spraying for termites is a home improvement is the evil the legislature was attempting to remedy by enacting the home improvement fraud statute. *Barger,* 587 N.E.2d at 1306. It is clear from the statute that the legislature's goal was to protect people, and particularly people at least sixty years of age, from being taken advantage of by persons performing or offering to perform work on the home. Certainly, misrepresenting that a home is infested with termites and then offering to spray the house for an exorbitant price is within the scope of the evil sought to be remedied by the home improvement fraud statute.

Therefore, we conclude that spraying for termites is a home improvement under the home improvement fraud statute.

## HOME IMPROVEMENT CONTRACT

■ Tucker next argues that there is no evidence that he caused Robinson to enter into a home improvement contract because Robinson had an existing termite control protection agreement with an extermination company, and Tucker merely misrepresented that he was doing the work pursuant to the existing contract. However, the existing agreement Robinson had with her exterminating company was for yearly termite *inspections*. There is no evidence that Robinson had an existing contract to actually exterminate termites. The evidence shows that Tucker caused Robinson to enter into a contract with him to actually spray for termites he told her he found in the house. The evidence supports the finding that Tucker caused Robinson to enter into a home improvement fraud contract.

## TWO CONTRACTS

■ Tucker next argues that the evidence does not support his conviction because there is no evidence that Robinson entered into two contracts. Tucker was charged with a Class C felony because the victim was more than sixty years of age and because more than one contract was entered into. *See* I.C. 35–43–6–13(c)(2). Tucker argues that there is only evidence of one contract and that the one contract covered extermination services for both of Robinson's houses. Tucker points to I.C. 35–43–6–4 to support his argument there is only one contract: "Multiple contracts entered into by a home improvement supplier with a consumer are considered a home improvement contract for the purposes of this chapter if the multiple contracts arise from the same transaction." Tucker interprets this statute to mean that as long as the home improvement contracts arise out of the same transaction, there can only be *one* home improvement contract. We disagree.

The statute defines "home improvement contract" as an agreement to make a home improvement and for which the contract price exceeds $150. The statute does not say that multiple "home improvement contracts" arising out of the same transaction are to be treated as one home improvement contract.

The statute says that multiple "contracts" arising from the same transaction are considered *a* "home improvement contract." In other words, several contracts that standing alone do not constitute a "home improvement contract," perhaps because the contract price is not enough, together may constitute a "home improvement contract" if they all arose from the same transaction. That is not the situation we have here. Here, each contract for Robinson's two houses meet the definition of a "home improvement contract." One contract was for improvements to Robinson's home with a price of $2400. The other contract was for improvements to Robinson's rental house, for which Tucker charged her $9600. *See* I.C. 35–43–6–5 (" 'home improvement contract price' means the amount actually charged for the services"). The evidence supports Tucker's conviction for home improvement fraud as a Class C felony.

## RESIDENTIAL PROPERTY

■ Tucker next argues that the evidence does not support his conviction because there is no evidence that both contracts covered residential property. Specifically, Tucker argues there is no evidence that Robinson's rental property was residential property. The evidence presented at trial showed that Robinson owned the home she lived in and also owned the house across the street, which she rented. Robinson's friend referred to the house across the street as the "tenant house." While scant, this was sufficient evidence for the jury to infer that the rental house across the street was residential property.

## PROSECUTORIAL MISCONDUCT

■ Tucker next argues that several acts of misconduct by the prosecutor had the cumulative effect of depriving him of due process and a fair trial. Specifically, Tucker points to:

1. The prosecutor's remark during opening argument that Tucker had recently been convicted of child molesting;

2. The prosecutor repeatedly referred to the victim as an "82–year old widow, mother, grandmother, great-grandmother" and

the evidence did not support that characterization;

3. On cross-examination of a defense witness, the prosecutor asked, "Do you know what perjury is?" and,

4. One of the State's witnesses referred to Tucker's "mug shot."

Because Tucker's trial counsel did not adequately object to each instance, Tucker also argues that the misconduct cumulatively amounts to fundamental error and also argues that his trial counsel was ineffective for failing to make proper objections. We need not discuss each instance of claimed misconduct because we find that the reference to Tucker's conviction of child molesting and his "mug shot" together prejudiced him and deprived him of a fair trial.

■ During the prosecutor's opening statement, the following occurred:

[Prosecutor]: Why? Why did· this happen? Well, ladies and gentleman, for the truth we have to back up a little bit. You see, on March 11th, 1991, the defendant, Charles Tucker, Sr., was convicted in Shelby Court ...

[Defense Counsel]: Objection, ...

[Prosecutor]: ... of child ...

[Defense Counsel]: ... Your Honor.

[Prosecutor]: ... molestation.

R. 350. After argument, the trial court sustained the objection. Defense counsel did not ask for the comment to be stricken or for the jury to be admonished, and the court did neither.

Later, during the State's direct examination of the investigating police officer, the following occurred:

Q. Did you interview Mildred Rogers?

A. Yes, I did.

Q. And did you show her any photos?

A. Yes. At the time uh, I think when I originally interviewed Eva and Mildred, I just had the one mug shot of Charles Tucker, Sr. I didn't have the photo line-up. And at the time I interviewed both the ladies, both of them said that was definitely the person, but that wasn't an actual photo line-up at the time.

R. 467. Defense counsel did not object to the reference to Tucker's mug shot and did not move to strike or to admonish the jury.

■ In determining whether trial counsel was ineffective for failing to object or move to strike and to admonish the jury, we must determine (1) whether trial counsel performed deficiently, and (2), whether counsel's deficient performance prejudiced Tucker. *Clark v. State* (1990), Ind., 561 N.E.2d 759, 762. To prevail on a claim that counsel was ineffective for failing to make a proper objection, it must be shown that a proper objection would have been sustained by the trial court. *Id.* at 763. Defense counsel's failure to prevent admission of inadmissible, prejudicial evidence demonstrates deficient performance. *Messer v. State* (1987), Ind.App., 509 N.E.2d 249, 251, *trans. denied.* Also, failure of defense counsel to object, including having the jury admonished, to prejudicial argument is deficient. *Id.* at 253.

Here, defense counsel objected to the prosecutor's comment that Tucker had been convicted of child molesting, but did not move to have the comment stricken from the record or to have the jury admonished. The trial court sustained Tucker's objection because the evidence of Tucker's child molesting conviction was irrelevant and prejudicial. *See James v. State* (1993), Ind., 613 N.E.2d 15, 22 (evidence of defendant's prior criminal history is highly prejudicial and should not be admitted). If counsel had moved to strike and to admonish the jury to disregard the comment, the trial court should have done so.

■ Additionally, references to police mug shots by the State is improper and in some instances highly prejudicial because of the tendency to cause jurors to suspect that the defendant has a criminal history. *Fox v. State* (1980), Ind.App., 399 N.E.2d 827, 830. Striking the reference and admonishing the jury is often an adequate cure. *Id.* Here, defense counsel did not object to the reference to Tucker's mug shot nor did he move to have the comment stricken and the jury admonished. If counsel had done so, the trial court should properly have stricken the comment and admonished the jury.

 Tucker has shown that his counsel was deficient with respect to the prosecutor's reference to Tucker's prior conviction and the reference to Tucker's mug shot. He has also shown that he was prejudiced by his counsel's deficiency. The evidence against Tucker was not overwhelming and the identification evidence was especially tenuous. We cannot say that the references to Tucker's criminal history did not impact the jury's decision. Tucker has shown that his counsel was ineffective. He is entitled to a new trial. Because we found the evidence was sufficient to sustain the conviction, double jeopardy principles do not prohibit a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

RUCKER, J., concurs in result.

KIRSCH, J., concurs.